**JUDSEN RUBBER WORKS, INC., Plaintiff,**

v.

**MANUFACTURING, PRODUCTION & SERVICE WORKERS UNION LOCAL NO. 24, Defendant.**

No. 94 C 5179.

United States District Court, N.D. Illinois, Eastern Division.

June 15, 1995.

Richard L. Marcus, William Martin Walsh, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Judsen Rubber Works, Inc.

David J. Mathews, John F. Ward, Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for Mfg. Production & Service Workers Union Local No. 24.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Judsen Rubber Works, Inc. ("Judsen") seeks to vacate a labor arbitration award in favor of defendant Manufacturing, Production and Service Workers Union Local No. 24 ("Local 24") pursuant to 29 U.S.C. § 185. Local 24 counterclaims for enforcement of the arbitration award. The parties' cross-motions for summary judgment, pursuant to Fed.R.Civ.P. 56, are presently before the court.

## BACKGROUND

The following undisputed facts are gleaned from the parties' respective Local Rule 12 statements of material facts and accompanying exhibits.[1]

1. Local Rule 12(M)(3) requires the party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 12(N)(3)(a) requires the opposing party to file a concise response to the movant's statement "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and any other supporting materials relied upon."

All material facts set forth in either party's statement will be deemed admitted unless controverted by the statement of the opposing party. *See* Local Rule 12(M); 12(N)(3)(b). In the instant case, both parties submitted Rule 12(M) statements in support of their respective motions for summary judgment which shall be referred to herein as "Pl.'s 12(M) Facts ¶ __" and "Def.'s 12(M) Facts ¶ __." The parties' respective re-

Judsen manufactures rubber products in Chicago, Illinois. Pl.'s 12(M) Facts ¶ 1. Local 24 represents a production and maintenance unit consisting of approximately 110 Judsen employees. Pl.'s 12(M) Facts ¶ 2. Judsen and Local 24 are parties to a collective bargaining agreement that is effective from April 13, 1992 through April 12, 1995 (the "CBA"). Pl.'s 12(M) Facts ¶ 3.

The underlying dispute in this case arose in July 1993 when Judsen changed its policy concerning wash-up, clean-up and punchout time. Article VIII of the CBA specifies the conditions under which employees are entitled to receive overtime pay; it provides that "for all hours worked in excess of eight (8) hours worked in any work day, for all hours worked in excess of forty (40) hours worked in any work week, and for all hours worked on Sunday during shifts commencing on or after 12:01 a.m." employees will receive overtime pay. Pl.'s 12(M) Facts ¶ 6. Although not mentioned in Article VIII, Judsen had a long-standing policy of allowing employees to stop working and use the last ten or fifteen minutes prior to the end of a regularly scheduled shift for wash-up purposes. Pl.'s 12(M) Facts ¶ 7. Regardless of whether the employees used this time to wash-up or not, Judsen automatically paid ¾ of an hour overtime compensation per week to all employees. Id. This practice was followed for at least 24 years [2] prior to the execution of the CBA, but was not mentioned, referenced or otherwise alluded to in the CBA. Id.

On July 6, 1993, Judsen unilaterally ended the practice of paying employees the automatic weekly overtime pay, although Judsen still allowed its employees to use the last ten or fifteen minutes prior to the end of the shift to wash-up.[3] Pl.'s 12(M) Facts ¶ 10. On July 19, 1993, Local 24 filed a grievance alleging that Judsen violated the CBA through its unilateral termination of the wash-up policy. Pl.'s 12(M) Facts ¶ 11. Pursuant to the terms of the CBA, the grievance proceeded to arbitration, and Arbitrator Edwin H. Benn (the "arbitrator") held that Judsen violated the CBA when it unilaterally terminated its practice of paying overtime for wash-up. Opinion and Award at 6.[4] Accordingly, the arbitrator ordered Judsen to reinstate the practice and make whole all employees affected by the change. Id. at 8.

In reaching his conclusion, the arbitrator relied on *United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, (1960), for the proposition that "*[b]ona fide* past practices rise to the level of explicit terms of the Agreement." Opinion and Award at 6. The arbitrator concluded that Judsen's practice of paying weekly overtime to employees for wash-up constituted a *bona fide* past practice, and therefore, carried the force of an explicit contractual provision of the collective bargaining agreement. Id. The arbitrator rejected Judsen's argument that Article VIII clearly and unambiguously provides the circumstances under which employees may receive overtime pay, and that past practice therefore cannot be used to imply a contractual term. Id. at 7. In rejecting this argument, the arbitrator stated that the ambiguity *vel non* of Article VIII was not the issue in this case:

> The question in this dispute is whether the long-standing practice ... is part of the Agreement irrespective of other provisions of the Agreement. As discussed above, this practice which has existed for 24 years is clearly part of the Agreement. That "clause" is not ambiguous.

sponses shall be referred to as "Pl.'s 12(N) Facts ¶ ___" and "Def.'s 12(N) Facts ¶ ___." For ease of exposition, where a fact is uncontroverted, only one party's statement will be cited.

2. Testimony was presented to the arbitrator establishing that the practice of paying employees overtime for wash-up was in existence for at least 24 years, and that the practice survived without alteration through numerous renegotiated contracts. Pl.'s 12(M) Facts, Ex. A, Opinion and Award, p. 6.

3. Judsen claims that the termination of the practice was in response to recent financial difficulties. Pl.'s 12(M) Facts ¶ 10. However, the arbitrator failed to establish the exact nature and extent of the plaintiff's financial difficulties. Def.'s 12(N) Facts ¶ 8–¶ 9.

4. At the hearing, Judsen also argued that Local 24's grievance was untimely. The arbitrator concluded otherwise, and Judsen does not challenge that holding here.

*Id.* As an additional basis for his decision, the arbitrator applied standard contract construction principles and reasoned that the "specific language" of the term implied by past practice governed over the "general language" found in Article VIII. *Id.*

Judsen refuses to abide by the arbitrator's award and instead has filed this suit to vacate the award. Judsen contends that under Article V, Section 6 of the CBA the arbitrator has "no authority to add to, take away from, amend, modify or nullify any of the provisions" of the CBA, Pl.'s 12(M) Facts ¶ 16, and that is what the arbitrator has done here; thus, Judsen argues that the arbitrator did not draw the essence of the award from the CBA but rather impermissibly modified the contract. Judsen sues under section 301 of the Taft–Hartley Act, 29 U.S.C. § 185, to set aside the arbitrator's award, and moves for summary judgment to vacate the award.

Local 24 counterclaims to enforce the award. Local 24 contends that the arbitrator acted within the scope of his authority in making the award; therefore, the union, not Judsen, is entitled to summary judgment.

## ANALYSIS

*Summary Judgment Standards*

■ Summary judgment is proper only if the record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must review all evidence in a light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.) *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–250, 106 S.Ct. at 2510–2511; *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513.

■ Where cross-motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. U.S.*, 996 F.2d 1455, 1461 (2d Cir. 1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993).

*Standard for Judicial Review of Labor Arbitration Awards*

■ The scope of judicial review of labor arbitration awards is extremely limited. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987); *Ethyl Corp. v. United Steelworkers of America*, 768 F.2d 180, 184 (7th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986). As the Supreme Court has observed, "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). Accordingly, courts are not authorized to reconsider the merits of an arbitration award. *Misco*, 484 U.S. at 36, 108 S.Ct. at 370; *Enterprise Wheel & Car*, 363 U.S. at 596, 80 S.Ct. at 1360.

■ In *Enterprise Wheel & Car,* the Supreme Court described the proper function of an arbitrator, as well as that of a reviewing court as follows:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

363 U.S. at 597, 80 S.Ct. at 1361; *see also Randall v. Lodge No. 1076, Int'l Ass'n of Machinists & Aerospace Workers,* 648 F.2d 462, 465 (7th Cir.1981) (noting that "the role of judicial review in the arbitration context is that the arbitrator's decision should not be upset unless it ... fails to draw its essence from the collective bargaining contract because it exceeds the confines of interpreting and applying the contract."). Thus, it is now well established that an arbitration award will be enforced "so long as it 'draws its essence from the collective bargaining agreement' even if the court thinks the arbitrator misconstrued the contract." *Ethyl Corp.,* 768 F.2d at 184.[5] In *Hill v. Norfolk & W. R.R. Co.,* the Seventh Circuit sketched the contours of judicial review of labor arbitration awards as follows:

> [T]he question for decision by a federal court asked to set aside an arbitration award ... is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract. [citations omitted] If they did, their interpretation is conclusive.... A party can complain if the arbi-

trators don't interpret the contract—that is, if they disregard the contract and implement their own notions of what is reasonable or fair. A party can complain if the arbitrators' decision is infected by fraud or other corruption, or if it orders an illegal act. But a party will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation. Granted, the grosser the apparent misinterpretation, the likelier it is that the arbitrators weren't interpreting the contract at all. But once the court is satisfied that they were interpreting the contract, judicial review is at an end, provided there is no fraud or corruption and the arbitrators haven't ordered anyone to do an illegal act.

814 F.2d 1192, 1194–95 (7th Cir.1987).

■ Consistent with the Supreme Court's admonition that an arbitrator is confined to interpretation and must not "dispense his own brand of industrial justice," the Seventh Circuit has counseled that "[i]t is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not to 'draw its essence from the collective bargaining agreement.' " *Ethyl Corp.,* 768 F.2d at 184–85. Any reasonable doubt whether the arbitrator interpreted the contract or relied on some private notion of equity must be resolved in favor of enforcing the award. *Id.* at 185 (citing *Enterprise Wheel & Car,* 363 U.S. at 597–98, 80 S.Ct. at 1361–62).

### The Present Case

Judsen argues that the arbitrator exceeded the scope of his authority when he impermissibly treated the past practice of paying overtime for wash-up as an express term of the CBA. Pl.'s Mem. at 6. Thus, we are squarely presented with a "recurring issue throughout the history of labor arbitration"—namely,

---

5. Speaking for the Seventh Circuit in *Ethyl Corp.,* Judge Posner observed that "[i]t might in retrospect have been better if the court had not said 'draws its essence from the collective bargaining agreement' ... but instead had made the test simply whether the arbitrator had exceeded the powers delegated to him by the parties." 768 F.2d at 184. The problem, as Judge Posner

saw it, is that the "draws its essence" judicial formula invites the error "of setting aside an arbitration award because the judge is not satisfied that the award has a basis in a particular provision of the contract," *id.*—a determination that ultimately rests on the judge's improper substitution of his or her own interpretation of the agreement for that of the arbitrator.

"the effect and enforceability of past practice." *Chicago Web Printing Pressmen's Union No. 7 v. Chicago Newspaper Publishers' Ass'n*, 772 F.2d 384, 387 (7th Cir.1985). And, we note that in view of the fine lines that must be drawn when reviewing an arbitral award that has invoked past practice, it is not at all surprising that the issue has recurred throughout the history of labor arbitration.

In the instant case, the arbitrator declared that *"[b]ona fide* past practices rise to the level of explicit terms of the agreement." Pl.'s 12(M) Facts, Ex. A, Opinion and Award at 6. In so stating, the arbitrator relied on *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), wherein the Court observed that "the arbitrator's source of law is not confined to the express conditions of the contract, as the industrial common law—the practice of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Id.* at 581–82, 80 S.Ct. at 1352–53.

However, the significance of the foregoing language from *Warrior & Gulf* cannot be read in isolation; rather, it must be understood within the context of *Warrior & Gulf*'s companion cases which together comprise the "Steelworker's Trilogy"—*United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) and *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). As we discussed above, the central teachings of *Enterprise* are that an arbitrator is "confined to interpretation and application of the collective bargaining agreement" and that an arbitral award is only enforceable to the extent that it "draws its essence" from that agreement. 363 U.S. at 597, 80 S.Ct. at 1361. Thus, the difficult problem presented by a case such as this is defining the proper exercise of the arbitrator's authority to rely on past practices while acting within the confines of his or her role of interpreting and applying the CBA.

■ The guidance provided by our Court of Appeals reveals that the above-quoted passage from *Warrior & Gulf* does not confer *carte blanche* upon arbitrators to imply contractual provisions into the CBA by looking to the past practices of the parties. Particularly instructive in this regard is *Chicago Web Printing Pressmen's Union No. 7 v. Chicago Newspaper Publishers' Ass'n*, 772 F.2d 384 (7th Cir.1985), which spoke directly to the meaning of the passage. In *Chicago Web*, although the arbitrator found that a certain seniority system was an established practice, he nevertheless found, due to changed conditions, that it was not part of the collective bargaining agreement. Accordingly, the arbitrator found that the company was entitled to unilaterally terminate the seniority system and the district court affirmed the arbitrator's decision. In its ill-fated appeal, the union argued that *Warrior & Gulf*'s statement that "the practices of the industry and the shop ... [are] equally a part of the collective bargaining agreement although not expressed in it," 363 U.S. at 582, 80 S.Ct. at 1352, mandated the result that once the arbitrator finds an established past practice it becomes "enshrined as part and parcel of the collective bargaining agreement, with the same binding effect on the parties as their contractual provisions." 772 F.2d at 388. Rejecting this contention, the Seventh Circuit observed:

> When read in context ... it is clear that the [*Warrior & Gulf*] Court was referring to the source of law that arbitrators, unlike the courts, are able to apply when solving labor disputes because of their familiarity with industry practices. [citation omitted] The Court did *not* hold, as the Union contends, that past practices are equivalent to contractual provisions, and thus binding on the parties, in all circumstances and for all purposes.

*Id.* n. 2. The court also provided the following enlightening discussion of the Supreme Court's invocation of the "industrial common law" in *Warrior & Gulf*, which we quote at length:

> The existence of this "industrial common law" does not necessarily mean ... that the parties should be bound by their customs to the same extent as by explicitly negotiated provisions in their collective

bargaining agreement. Unlike contractual agreements, past practices may not always be the result of joint determination:

> They may be mere happenstance, that is, methods that developed without design or deliberation. Or they may be choices by Management in the exercise of managerial discretion as to the convenient methods at the time. In such cases there is no thought of obligation or commitment for the future. Such practices are merely present ways, not prescribed ways, of doing things.

Elkouri & Elkouri, *How Arbitration Works* 394 (3d ed. 1976) (quoting *Ford Motor Co.,* 19 Lab.Arb. (BNA) 237, 241–42 (1952)). To place past practice on a par with the parties' written agreement would "create the anomaly that, while the parties expend great energy and time in negotiating the details of the Agreement, they unknowingly and unintentionally commit themselves to unstated and perhaps more important matters which in the future may be found to have been past practice." *Id.* Thus, once a past practice is established, it is not always enforced by arbitrators to the same extent as contractual terms, *see* Elkouri & Elkouri, *How Arbitration Works* 400, and may be modified or eliminated by the employer where the underlying basis for the practice has changed[.]

772 F.2d at 387–88. Thus, under the law of this Circuit, the parties' past practices are not necessarily equivalent to contractual provisions.[6] The arbitrator in the instant case appears not to have appreciated this fact— effectively deciding this case solely based on his determination that the parties' past practice was indistinguishable from an express written provision of the contract.

■ We return now, to examine the critical question posed by this case, namely, when is implying a contractual term from past practice proper as opposed to constituting an impermissible modification of the contract. *Chicago Web* illustrates one circumstance in which reliance on past practice is proper— namely, where the CBA is silent on a particular issue. *See Chicago Web,* 772 F.2d at 385 ("The final collective bargaining agreement was silent on the issue of how seniority was to be determined."). Yet another case involving the Printing Pressmen's Union No. 7 and the Newspaper Publishers' Association illustrates another instance in which reliance on past practice is unquestionably appropriate—namely, where the arbitrator's task involves interpreting "provisions of the contract which would be ambiguous absent reference to the prior practice" of the parties. *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7,* 821 F.2d 390 (7th Cir.1987) (hereafter referred to as *CNPA* ). In *CNPA,* the arbitrator was called upon to decide whether the Chicago Tribune had violated its collective bargaining agreement with the Pressmen's Union by bypassing the Union's call room procedure when it promoted certain apprentice pressmen to fill vacant journeymen positions. The arbitrator, relying on the parties' past practice of hiring journeymen from the Union call room, concluded that the Tribune violated the agreement. The arbitrator rejected the Publishers' Association's argument that past practice was irrelevant, responding that "[t]here are numerous provisions of the agreement which make reference to the call room and the hiring of journeymen pressmen.[7] Those provisions would be difficult, if not impossible to properly understand and apply in the absence of any evidence concerning their past operation and interpretation." *CNPA,* 821 F.2d at 396 (quoting the Arbitration Opinion). In affirming the district court's affirmance of the arbitration award,

---

**6.** Of course, *Chicago Web* does not foreclose a determination in a particular case that past practice should be accorded the status of an explicit contractual provision. But it does foreclose the argument that past practice *per se* rises to the level of an explicit contractual term. At the very least, *Chicago Web* indicates that the arbitrator should determine whether a change in conditions has occurred such that the past practice should not be deemed a part of the collective bargaining agreement. The arbitrator did not do that in the instant case.

**7.** [This Court's footnote.] Although the opinion does not shed much light on what contractual provisions the arbitrator was referring to, the opinion does note that "in section 43 of the agreement the Employer and the Union 'recognize[d] the need for the continuing existence of the call room.' " 821 F.2d at 393.

the Seventh Circuit observed, "[i]n rendering this award, the arbitrator did nothing more than refer to the past practices of the parties to interpret the contract." *Id.* at 396. The court added:

> Here the arbitrator demonstrated that he was aware of the limits of his authority when he stated that he was not "free to add to, subtract from, or modify the provisions of the agreement" since interpreting the contract in that manner would violate the clear dictates of the contract. The arbitrator noted that he only utilized the past practices of the parties to interpret provisions of the contract which would be ambiguous absent reference to the prior practice of the Tribune and the Union. We do not find the arbitrator's decision in the present case to be a "manifest disregard of the agreement, totally unsupported by principles of contract construction."

*Id.* at 397. The significance of this passage lies not in the fact that the arbitrator spoke some magic words indicating that he was interpreting the contract—this is, of course, unnecessary, *Ethyl Corp.*, 768 F.2d at 187 ("This is not to say that simply by making the right noises—noises of contract interpretation—an arbitrator can shield from judicial correction an outlandish disposition of a grievance."); rather, the passage is instructive insofar as it recognizes a distinction between properly relying on past practice to interpret a contract and improperly relying on past practice to modify a contract. *See id.* at 186 ("Inferring an implied condition must be distinguished from creating one, tenuous as the distinction may be as a practical matter. The arbitrator may not modify the contract unless authorized to do so.") The key, as we read the Seventh Circuit opinions, is that reliance on past practice is proper where it is in the service of interpreting the contract rather than serving as a mechanism to rewrite a contract based on the arbitrator's sense of industrial fairness. *See Tootsie Roll Indus., Inc. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers' Int'l Union*, 832 F.2d 81, 84 (7th Cir.1987) ("[R]eliance on the law of the shop is appropriate to interpret ambiguous contract terms ... the law of the shop cannot be relied upon to modify clear and unambiguous provisions.").

In this regard, we find the following passage concerning past practice and the "common law of the shop" instructive:

> when there are overlapping contracts, or where a party seeks to disambiguate a contractual provision by reference to the parties' practices, the concept of the "common law of the shop" comes into play.... But this is not true common law; it is an interpretive concept. It denotes a methodology for interpreting a written contract....

*International Ass'n of Machinists & Aerospace Workers, Progressive Lodge No. 1000 v. General Elec. Co.*, 865 F.2d 902, 906 (7th Cir.1989) (citations omitted). This passage reinforces our conclusion that past practice and the common law of the shop are not licenses for creating new contractual terms but are merely vehicles for contract interpretation. Thus, we conclude that for reliance on past practice to be proper, it must be predicated on some need for interpretive assistance. Certainly, where a contractual term is ambiguous, or where a provision cannot be understood without reference to past practices, or where the agreement itself makes reference to the parties' past practice, reliance on past practice is wholly proper; however, absent some such consideration (and we did not, of course, attempt to be exhaustive), we believe that reliance on past practice crosses the fine line between interpretation and modification.

With the foregoing principles in mind, our review of the arbitration award in this case convinces us that the arbitrator acted outside the scope of his authority in relying on the parties' past practice to modify the parties' agreement and, hence, he did not base his award on the essence of the CBA.

As we discussed above, the arbitrator misread *Warrior & Gulf* for the unqualified proposition that "[b]ona fide past practices rise to the level of explicit terms of the Agreement." Upon determining that Judsen's practice of paying weekly overtime for wash-up was a *bona fide* past practice, the arbitrator conferred contractual status to the

practice and then proceeded to apply the contract *as modified.*

We conclude that the arbitrator modified, rather than interpreted, the contract for several reasons. First, the point of departure for the arbitrator's discussion of the merits of Local 24's grievance is his determination that the parties' past practice constitutes an express provision of the CBA. Everything that follows in the arbitrator's decision is derivative. There is no indication whatsoever, that the arbitrator relied on past practice as an interpretive device; instead, the arbitrator automatically elevated the past practice to contractual status as a first premise in resolving the grievance, even though he recognized that it created a conflict with other provisions of the CBA. This is evident from several of the arbitrator's assertions most notably:

> [T]he focus of this dispute is not whether some other clause of the Agreement is ambiguous—in this case Article VIII. The question ... is whether the long-standing practice ... is a part of the Agreement irrespective of other provisions of the Agreement.

and

> [I]t may well be that there is a conflict between payment at the overtime rate for washup and cleanup time and the provisions of Article VIII.... But that perceived conflict does not change the result.... The past practice of payment for washup and cleanup time which has been elevated to the terms of language of the Agreement is ... the specific governing "language."

Opinion and Award at 7. These remarks are direct proof that the arbitrator looked to past practice not to interpret the terms of the contract, but rather, in spite of the terms of the contract.

Additionally, the arbitrator's Award and Opinion is silent on the meaning or significance of Article VIII's provisions regarding overtime; in particular, he does not even intimate that those provisions are in need of interpretation. Instead, his only mention of Article VIII is in the context of asserting that whatever Article VIII says, it is trumped by past practice—which, by his hand, has been elevated to contractual status.[8] In fact, the overriding import of the Opinion is that there is no need to interpret the written agreement because the contractual term implied by past practice is dispositive.

The arbitrator only employed rules of contract interpretation *after* he had elevated the parties' past practice to contractual status. It is only at that point that he purported to apply a clear and unambiguous contractual term—namely, the implied term. Similarly, it is only at that point that he applied the "axiomatic rule of contract construction that '[w]hen there is a conflict between specific language and general language in an agreement, the specific language will govern.'" *Id.* at 7. And, as we have seen, the arbitrator considered "[t]he past practice of payment for washup and cleanup time which has been elevated to the terms of language of the Agreement [as] ... the specific governing 'language.'" *Id.* Finally, it is only after the arbitrator elevated the past practice to the level of a contractual term that he concluded that he was not violating the Article V, § 6's mandate that he not "add to, take away from, amend, modify or nullify any of the provisions of [the] Agreement," simply stating, "The past practice is part of the Agreement."

---

8. We are mindful of the Seventh Circuit's statement in *Ethyl Corp.* that "there is no rule that an arbitrator, in order to find an implied condition, must first find the language of the contract to be ambiguous," 768 F.2d at 186, and we apply no such rule here. Rather, our point is that there is nothing in the arbitrator's Opinion that even remotely suggests he is attempting to interpret the Agreement; indeed, everything militates against such a conclusion. Absent, for example, is any indication that he found the Agreement ambiguous or wholly silent on an issue, or that he found terms that could only be understood by reference to past practice, etc. In fact, in responding to Judsen's argument that he should not look to past practice because the terms of Article VIII were clear and unambiguous, the arbitrator did not even take the opportunity to consider whether the agreement contained clear and unambiguous language; instead, he rebuffed the argument stating that the language of the "clause" implied from past practice was not ambiguous. Opinion and Award at 7.

It is fair to summarize the arbitrator's fundamental reasoning in this case as follows: Regardless of the content of the parties' bargained for agreement, past practice constitutes a contractually binding provision and Judsen violated that provision. Borrowing from the applicable standard in this case, we must conclude that the arbitrator's award "draws its essence" solely from the parties' past practice.

Local 24's reliance on *Ethyl Corp.* and *Dreis & Krump Manufacturing Co. v. International Ass'n of Machinists and Aerospace Workers, Dist. No. 8*, 802 F.2d 247, 252 (7th Cir.1986), is misplaced in this case. Local 24 relies on both of these cases for their broad language to the effect that a CBA need not be read literally and that implied terms may be read into a CBA, *see Ethyl Corp.*, 768 F.2d at 185–86; *Dreis*, 802 F.2d at 253; and, of course, we have no quarrel with such well-established propositions. However, even the broad language of *Ethyl Corp.* and *Dreis* buys Local 24 very little because those cases simply did not present the issues confronted here.

The arbitrator in *Ethyl Corp.* was presented with a situation in which the employer prevented employees from earning vacation in a certain year by laying them off—temporarily, as it turned out—thereby foreclosing their ability to work the requisite number of hours. In an effort to interpret the parties' CBA in light of the circumstances, the arbitrator "applied ... a traditional principle of contract law: that you cannot prevent the other party to the contract from fulfilling a condition precedent to your own performance, and then use that failure to justify your nonperformance." 768 F.2d at 185. The Seventh Circuit found that by inferring this doctrine of conditions into the contract, the arbitrator was doing no more than reading the contract in a methodologically "conventional" fashion. *Id.* at 187. Thus, *Ethyl Corp.* teaches that an arbitrator is not confined to a literal reading of the contract terms and may apply traditional doctrines of contract law to infer implied conditions into the contract; however, *Ethyl Corp.* does not speak at all to the parameters of an arbitrator's proper use of past practice to imply terms or conditions into a contract.

Similarly, *Dreis* does little more than repeat, in a context quite different than is presented here, *Ethyl Corp.*'s unquestioned propositions that CBA's may be read to contain implied terms and that arbitrators are not required to read a CBA literally. Again, *Dreis*, like *Ethyl Corp.*, did not involve the use of past practice to impute a term into a contract as is the case in the instant lawsuit. Rather, the arbitrator in *Dreis* looked to past practice only as a "test of contractual meaning"—or, more precisely, as an element of his analysis of whether the challenged conduct of the employer was reasonable and in good faith *vis-a-vis* the collective bargaining agreement. *Dreis*, 802 F.2d at 254. Indeed, a careful reading of *Dreis* reveals that the only implied term involved in that suit was the implied "obligation on management to not enter upon a unilateral course of conduct, the effect of which would render the contractually protected scope of the bargaining unit null and void." *Id.* at 253 (quoting the Arbitrator's Opinion). Thus, it was clear to the court in *Dreis* that, to the extent that the arbitrator relied on past practice, it was only as a tool in aid of applying the CBA—not to impute a substantive term into the contract. Thus, beyond setting out the general standards and governing principles, we conclude that *Dreis* and *Ethyl Corp.* shed little light on the issues presented in this case.

In sum, this is not a case where there is any doubt regarding whether the arbitrator interpreted the CBA—in which case we would be obliged to enforce the arbitration award, *see Ethyl Corp.*, 768 F.2d at 185 ("any reasonable doubt [regarding whether the arbitrator has interpreted the contract] must be resolved in favor of enforcing the award")—he clearly did not. Instead, he simply implied a contractually binding term from the parties' past practice and found that this term was violated by Judsen's conduct. We are completely unable to divine any sense in which " 'the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement.' " *Ethyl Corp.*, 768 F.2d at 186 (quoting *Desert Palace, Inc. v. Local Joint*

*Executive Bd.*, 679 F.2d 789, 793 (9th Cir. 1982)). Perhaps more to the point we are unable to conclude that the arbitrator's reliance on past practice in this case fell within the confines of his authority to interpret and apply the terms of the parties' CBA. Accordingly, we find that the arbitrator acted outside the scope of that authority and that his award does not "draw its essence" from the CBA.

## CONCLUSION

For the foregoing reasons, plaintiff Judsen Rubber Works, Inc.'s motion for summary judgment is granted and the May 28, 1994 Arbitration Opinion and Award is hereby vacated. Defendant Manufacturing, Production and Service Workers Union Local No. 24's cross-motion for summary judgment is denied. The Clerk of the Court is directed to enter a final judgment order pursuant to Fed.R.Civ.P. 58 in favor of plaintiff Judsen Rubber Works, Inc. and against defendant Manufacturing, Production and Service Workers Union Local No. 24.